UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Theresa Gatten,                                                  Civil No. 11-2962 (DWF/JSM)

          Plaintiff,

v.                                                               **MEMORANDUM**
                                                                 **OPINION AND ORDER**
Life Time Fitness, Inc.,

          Defendant.

_____

James H. Kaster, Esq., and Sofia B. Andersson-Stern, Esq., Nichols Kaster, PLLP, counsel for Plaintiff.

Jaime N. Cole, Esq., and Patrick R. Martin, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., counsel for Defendant.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Life Time Fitness, Inc. ("Life Time") (Doc. No. 19). For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Life Time employed Plaintiff Theresa Gatten ("Gatten") from September 2007 through January 2011, in various positions at its Lakeville and Savage clubs. (Doc. No. 22, Cole Decl. ¶ 4, Ex. A (Gatten Dep.) at 33-35.) In the summer of 2008, Gatten became pregnant, and in April 2009, she delivered a stillborn son. (Doc. No. 27,

Andersson-Stern Aff. ¶ 3, Ex. A.)  Gatten took six weeks off from work and returned on June 8, 2009.  (*Id*.)  In December 2009, Life Time promoted Gatten to the Life Spa Department Head ("Department Head") position at the Savage location.  (Gatten Dep. at 34.)

As Department Head, Gatten generally led and managed team members and the daily operations of the Life Spa.  (*Id*. at 45-47, Ex. 6.)  These responsibilities included: (1) meeting or exceeding monthly and annual department product and service goals; (2) monitoring revenue, refunds, money transactions, and credit cards; (3) overseeing department budget and participating in annual planning; (4) monitoring profit and loss statements; (5) completing payroll and ensuring labor costs were within the budget; (6) reporting weekly and monthly revenue totals and projections; and (7) maintaining inventory and supplies.  (*Id*.)  Gatten was also tasked with making sure team members she supervised received and completed training.  (*Id*. at 36, Ex. 2 at 17.)  As part of the training for her new position, Gatten completed a 2-3 day training course, and received help from Erin Yearneau (formerly, Erin Hein) (Life Spa Regional Lead), Chris Aamot (Life Spa National Manager), and Mel Arnold (Life Spa National Lead).  (Gatten Dep. at 49-52; Cole Decl. ¶ 6, Ex. C (Yearneau Dep.) at 21.)

In February 2010, Joe Liotine became the new General Manager at the Savage club.  (Gatten Dep. at 59; Cole Decl. ¶ 5, Ex. B (Liotine Dep.) at 22.)  During the first weekly Department Head meeting with Liotine, all persons present introduced themselves and shared information such as family information and their fitness regimen.

(Gatten Dep. at 59.) Gatten shared about her family, including the loss of her son, and became emotional. (*Id*. at 59-60.) Gatten testified that at her first "one-on-one meeting" with Liotine, Michelle Bjornberg (the club's Business Administrator) was also present. (*Id.* at 61.) Gatten recalls that, at this meeting, Liotine brought up the birth of her stillborn son, and that Liotine expressed concern that the loss of her son was affecting her performance. (*Id*.) Liotine testified at his deposition that during this meeting with Gatten and Bjornberg, he suggested that Gatten attempt to focus on business with her team, and to attempt to keep personal issues separate. (Liotine Dep. at 92-93.) Liotine explained to Gatten that some team members had complained that Gatten often brought up the issue of her stillborn son with team members and that Gatten often became emotional at work. (*Id.* at 43-44, 92-95.) Gatten became very emotional during this meeting. (*Id.* at 94-95.) Liotine explained that team members were uncomfortable when Gatten became emotional talking about her son. (Gatten Dep. at 62.) Liotine offered Gatten access to the Employee Assistance Program ("EAP"). (Liotine Dep. at 93.)[1]

Life Time submits that team members continued to complain about Gatten's tendency to become emotional on the job and her resulting problems with performance. (Liotine Dep. at 59-60; Cole Decl. ¶ 9, Ex. F (LeJeune Dep.) at 16; Cole Decl. ¶ 8, Ex. E (Bjornberg Dep.) at 36.) Life Time claims that Gatten had difficulty fulfilling her

---

[1] Liotine also testified during his deposition that Gatten was often very emotional and cried in the administrative office, and that he spent time listening to Gatten's personal issues. (Liotine Dep. at 36, 42-43.) Liotine also testified that Gatten was missing about two days of work per week. (*Id.* at 46.)

responsibilities as a Department Head, such as managing profit and loss statements, maintaining inventory, and ensuring her team was trained. Aamot communicated with Liotine about Gatten's performance issues. (Cole Decl. ¶ 7, Ex. D (Aamot Dep.) at 21-26.) Gatten maintains that she performed well in the spa as a Department Head, consistently met her revenue goals, and received a positive evaluation. (Andersson-Stern Decl. ¶ 3, Exs. B, C, D.)

In June 2010, Gatten became pregnant again. (*Id*. ¶ 3, Ex. A.) Gatten told Liotine about the pregnancy. (*Id*.) A few weeks later, Gatten miscarried. (*Id*.) In August 2010, Gatten became pregnant again, and she told Liotine about the pregnancy. (*Id*.)

Life Time submits that Gatten's performance continued to suffer, and on August 11, 2010, Liotine placed Gatten on a Performance Improvement Plan ("PIP"). (Liotine Dep. at 66, 122-34 & Exs. 7, 9-11, 13.) Gatten was given until September 30 to improve her performance before being terminated. (Liotine Dep. at 123.) Gatten submits that the PIP was not warranted and that she believed she was already accomplishing many of the items listed, although she did acknowledge areas that could be improved. (Gatten Dep. at 91, 111.) As part of the PIP, Gatten was required to have a one-on-one meeting with Liotine every week. (Andersson-Stern Decl. ¶ 3, Ex. F.) Gatten claims that this did not occur, and that when she did meet with Liotine, he would bring up her miscarriages within the discussion of her poor performance. (Gatten Dep. at 109-10.) Gatten also testified that Liotine brought to her attention that "these miscarriages and [her stillborn son] are causing these PIPs and [Gatten's] performance in the spa." (*Id*. at 110.)

Gatten claims that she worked hard during her PIP, and that around September 20, 2010, Liotine told Gatten that she was passing her PIP. (Gatten Dep. at 131-32.)

Specifically with respect to training, Life Time submits evidence that Gatten failed to ensure that a new team member, Tammi Wilson, received training by June 2010, which was against the company's policy. (*Id*. at 113-15.) Via an e-mail dated July 1, 2010, Aamot notified Gatten that Wilson needed to be trained and directed Gatten to schedule Wilson's training "ASAP." (Liotine Dep., Ex. 5.)

Life Time submits that Gatten's performance continued to suffer, and that by September 29, 2010, Life Time had decided that Gatten would no longer be a Department Head. (Doc. No. 23, Liotine Decl. ¶ 8.) For example, as of September 24, Wilson had still not received the required training. (Aamot Dep. at 59-65.) Liotine claims that after he learned that Wilson had not been trained, he wanted to terminate Gatten's employment and sent an e-mail to Chris Fazi, the Regional General Manager, to this effect. (Liotine Decl. ¶ 8, Ex. B.) The September 29, 2010 e-mail to Fazi read: "It is time for us to review PIP and move forward. I can post for the position on Friday afternoon." (*Id*.)

On September 30, the last day of her PIP and the day on which the September inventory had to be completed, Gatten suffered a miscarriage. (Gatten Dep. at 130-31.) Gatten claims that she told Liotine. (Andersson-Stern Decl. ¶ 3, Ex. A.) Liotine disputes that he was told about this miscarriage. (Liotine Dep. at 85-86, 169-70.) Gatten claims that Liotine told her she could go home, so long as she was back before midnight to finish her inventory. (Andersson-Stern Decl. ¶ 3, Ex. A.) Gatten also told Yearneau that she

5

was miscarrying, and Yearneau told Gatten to go home and that she would help complete the inventory. (Yearneau Dep. at 30.) Gatten returned to work on October 1 to make sure inventory reports were complete. (Gatten Dep. at 131.)

On October 4, 2010, Gatten's first full day back to work after her miscarriage, Liotine called Gatten to "prep" her on her PIP before they met with Fazi. (Gatten Dep. at 131-32.) When Gatten's PIP expired, Fazi and Liotine met with Gatten. (Andersson-Stern Decl. ¶ 3, Ex. H (Fazi Dep.) at 18-19; Gatten Dep. at 132-34.) Gatten was told that she had failed to meet the leadership objectives of her PIP. (Fazi Dep. at 33.) Fazi offered Gatten a position as an Assistant Department Head in St. Louis Park, or, in the alternative, she could voluntarily leave the company. (Fazi Dep. at 18.) Gatten went on short-term disability leave. (Gatten Dep. at 137-38.) Gatten took leave from mid-October until the beginning of January 2011, at which time Gatten resigned. (Gatten Dep. at 143-44.)

In this action, Gatten alleges two counts against Life Time: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964; and (2) sex discrimination in violation of the Minnesota Human Rights Act ("MHRA"). (Doc. No. 1, Compl. ¶¶ 25-26.) Life Time now moves for summary judgment. (Doc. No. 19.)

## DISCUSSION

**I.   Summary Judgment Standard**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**II.     Motion for Summary Judgment**

Gatten brings sex discrimination claims pursuant to Title VII and the MHRA. 42 U.S.C. § 2000e–2(a); Minn. Stat. § 363A.08, subd. 2.[2] Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any

---

[2]     The Court analyzes claims under Title VII and the MHRA using the same principles. *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 574, n.4 (8th

(Footnote Continued on Next Page)

individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). The Pregnancy Discrimination Act amended Title VII's prohibition on sex discrimination to include discrimination based on "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). The MHRA defines "sex" to include "pregnancy, childbirth, and disabilities related to pregnancy or childbirth." Minn. Stat. § 363A.03, subd. 42.

A Title VII plaintiff may avoid summary judgment by presenting either direct or indirect evidence of discrimination. *See Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809-10 (8th Cir. 2007). Direct evidence shows a specific link between the alleged discriminatory animus and the challenged employment decision that is sufficient to support a finding by a reasonable fact finder that an illegitimate criterion motivated the employment decision. *See id*. at 809. When analyzing indirect evidence, the Court applies the burden-shifting framework promulgated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Fjelsta*, 488 F.3d at 801; *Griffith v. City of Des Moines,* 387 F.3d 733, 736-37 (8th Cir. 2004). At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was a motivating factor in the adverse employment action. *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008).

Here, Plaintiff alleges that she has both direct and indirect evidence of discrimination. For purposes of this motion, the Court considers Plaintiff's indirect

---

(Footnote Continued From Previous Page)
Cir. 1997).

evidence. Under the *McDonnell Douglas* framework, if Gatten is able to establish a prima facie case of discrimination, the burden shifts to Life Time to produce a legitimate, non-discriminatory reason for the adverse employment action. *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011). If Life Time is able to articulate such a reason, the burden then shifts back to Gatten to produce evidence sufficient to create a genuine issue of material fact showing that the proffered reason is merely a pretext for discrimination. *Id.* Again, the issue is whether Gatten can produce sufficient evidence that unlawful discrimination was a motivating factor in Life Time's employment decision. *Id.* (citing *Roberts,* 528 F.3d at 1127).

### A.     Prima Facie Case

To establish a prima facie case of gender discrimination, a plaintiff must show that she: (1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action; and (4) that the alleged facts that give rise to an inference of discrimination. *Norman v. Union Pacific R.R. Co.*, 606 F.3d 455, 460-61 (8th Cir. 2010). For purposes of its motion for summary judgment, Life Time argues that Gatten cannot establish a prima facie case of pregnancy discrimination because she fails to meet the second and fourth elements—that Gatten was qualified for her position and that she has alleged facts that give rise to an inference of gender discrimination.

To satisfy the qualification element, Gatten need only prove that she was qualified for her position. *Arnold v. Nursing and Rehab. Cent. at Good Shepherd, LLC*, 471 F.3d 843 (8th Cir. 2006), abrogated on other grounds by *Torgerson v. City of Rochester*, 643

9

F.3d 1031, 1032 (8th Cir. 2011). The Court first concludes that because Gatten was hired as a Department Head and held that position for over ten months, the second element is satisfied. *See also Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91 (2d Cir. 2001) ("[W]here discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw . . . ").

The Court next turns to the fourth element—inference of discrimination. Life Time argues that Gatten's pregnancy and September 30 miscarriage had nothing to do with her demotion. Life Time submits that the evidence demonstrates, as a matter of law, that the bases for her PIP were real, that by late September, Gatten had failed to correct her performance lapses, and in particular that Life Time had decided to demote Gatten prior to her miscarriage on September 30. In support of the latter contention, Life Time relies on Liotine's September 29 e-mail: "It is time for us to review PIP and move forward. I can post for the position on Friday afternoon." (Liotine Decl. ¶ 8, Ex. B.) Life Time submits that this e-mail negates Gatten's contention that her demotion stemmed from her September 30 miscarriage.

Gatten submits that she was placed on a PIP and terminated under circumstances giving rise to an inference of discrimination. First, Gatten points to comments made by Liotine regarding Gatten's miscarriages. Second, Gatten submits that the timing of Gatten's PIP and termination is suspicious. For example, Gatten points out that Liotine placed her on a PIP a few days after learning that she was pregnant and only one month after learning of her June miscarriage. In addition, Gatten points out that she was

10

removed as Department Head on her first full day back at work after her September 30 miscarriage. Gatten disputes that the bases for the PIP were real and argues instead that the reason for the PIP was her miscarriages. Gatten also submits that she fixed the issues identified in her PIP, and that Liotine told her that she was passing the PIP just over a week before her termination.

Viewing the record evidence in the light most favorable to Gatten, the Court concludes that a reasonable jury could conclude that Gatten was placed on a PIP and removed as a Department Head under circumstances giving rise to an inference of discrimination. In particular, both the comments made by Liotine regarding Gatten's miscarriages in the context of her performance problems, as well as the temporal proximity of those comments to her being placed on a PIP and, ultimately, her removal as Department Head, could lead a reasonable juror to infer discriminatory intent. Accordingly, the Court concludes that Gatten meets the requirements for establishing a prima facie case of pregnancy discrimination.

### B.   Legitimate, Nondiscriminatory Reason and Pretext

Life Time submits that Gatten failed to adequately perform her job as Department head—specifically, that Gatten cried often and was not able to otherwise complete her required job responsibilities. Life Time submits evidence that team members complained about her performance and that Gatten, herself, has admitted that she was aware that she needed to improve in certain areas. Life Time further submits that after receiving her PIP, Gatten continued to fall short on her job performance and was, generally, unable to

manage the spa. Life Time relies heavily on Gatten's failure to properly train her team members despite orders and company policy to do so. Based on this evidence, the Court concludes that Life Time has articulated legitimate, non-discriminatory reasons for placing Gatten on a PIP and for removing her as Department Head.

Gatten therefore must provide evidence of pretext—that Life Time's reason for the adverse employment actions was pretext for pregnancy discrimination. A plaintiff may succeed at the pretext stage by showing sufficient evidence that a prohibited reason motivated the employer. *Roberts*, 528 F.3d at 1127. Gatten argues that she has pointed to substantial evidence of pretext and that pregnancy discrimination actually motivated Life Time's decision for Gatten's PIP and demotion. Specifically, Gatten points to evidence that: Liotine would bring up Gatten's miscarriages when discussing her job performance; Gatten was placed on a PIP days after Liotine learned she was pregnant and was removed as Department Head on her first full day back after her September miscarriage; and Liotine told Gatten that she was passing the PIP shortly before her termination. Gatten also submits additional evidence that Liotine did not intend to terminate Gatten at the end of her PIP.

The Court concludes that, viewing the facts in the light most favorable to Gatten, there is a genuine issue of material fact as to whether Life Time's decision to place Gatten on a PIP and to remove her as a Department Head was motivated by Gatten's alleged performance deficiencies or whether Gatten's pregnancies and miscarriages were a motivating factor in these employment decisions. Based on the evidence, a reasonable

jury could conclude that Life Time's decisions were motivated by discriminatory intent. The Court notes, however, that this is not to say that a jury would necessarily find that Life Time was motivated by discriminatory animus. Life Time has submitted evidence that, if believed by a jury, could very well demonstrate serious job performance issues on Gatten's part. The jury could also reasonably conclude that Gatten was placed on a PIP and removed as Department Head because of her performance deficiencies.

In short, there are also factual disputes regarding the role that Gatten's pregnancies and miscarriages played, if any at all, in Life Time's employment decisions. These factual disputes, however, cannot be resolved on a motion for summary judgment, and the Court therefore concludes that the record evidence in this case is enough to create issues for trial. The Court strongly cautions Gatten, however, from equating a narrow victory at this stage with a victory at trial.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. [19]) is **DENIED**.


Dated: March 29, 2013                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge